Filed 11/06/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TROY SON,<br><br>    Defendant and Appellant. | G057657<br><br>(Super. Ct. No. 15WF1099)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is hereby ordered that the opinion filed on October 19, 2020, be modified as follows:

On page 14, delete the first sentence of the last paragraph, which reads, "Our resolution of this issue resolves the remainder of the appeal."

On page 14, after the last full paragraph, add the following new heading and paragraph:

*Federal Due Process*

Finally, defendant argues the above alleged errors constitute a violation of his federal due process rights, even if not reversible under state law. The argument is meritless. The narration of the video was admissible under state law and the prosecutor's

second-shot example was harmless under state law.  Neither of these rulings, under the circumstances of this case, rendered the trial "fundamentally unfair."  (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*]; *People v. Caldwell* (2013) 212 Cal.App4th 1262, 1274 ["A prosecutor's conduct violates the due process clause of the Fourteenth Amendment to the United States Constitution when the prosecutor's misconduct renders the trial 'fundamentally unfair'"].)  As explained, neither the admission of the evidence, nor the argument of the prosecutor, came close to rendering this trial fundamentally unfair.

There is no change in the judgment.

The petition for rehearing is DENIED.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.


2

Filed 10/19/20 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TROY SON,<br><br>    Defendant and Appellant. | G057657<br><br>(Super. Ct. No. 15WF1099)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge. Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Troy Son was charged with murder (Pen. Code, § 187, subd. (a)) with an enhancement for the personal use of a deadly weapon (Pen. Code, § 12022, subd.

(b)(1)).  The jury found defendant guilty of first degree murder, unanimously finding that the murder was willful, deliberate and premeditated and committed by lying in wait.  The jury found the weapon use allegation to be true.  Defendant was sentenced to a state prison term of 26 years to life, comprised of 25 years to life for the murder, plus a consecutive one year for the enhancement.

Defendant raises three issues on appeal.

First, defendant contends the court committed evidentiary error by permitting a detective to describe the events of a surveillance video that was subsequently watched by the jury.  The court did not abuse its discretion, however, as the detective's narration was admissible lay testimony based on her extensive review of the video.

Defendant's second and third arguments go to each of the first-degree murder theories.  The jury made separate findings on two theories of first-degree murder: premeditation, and lying in wait.  Defendant contends both were infected with error.  To prevail on appeal, he must prevail on both arguments—if either the premeditation or lying-in-wait finding is upheld, then any error in the other is necessarily harmless.

As to premeditation, defendant argues the prosecutor committed misconduct when explaining the concept of premeditation by offering two improper examples:  the decision to drive through a yellow light, and the decision to fire a gun not just once, but a second time.  We take no issue with the yellow light example.  In the way the prosecutor described that example, it accurately depicted the sort of calculated, deliberate choice that constitutes premeditation.  As to the second-shot example, we agree that it was somewhat suspect.  There certainly are cases where the number of shots fired can indicate premeditation, but not always.  Nevertheless, the example was harmless:  the multiple-shots example is not entirely wrong, the prosecutor mentioned it only briefly, this was not a gun case, the issue of premeditation hinged on defendant's mental health, and the court properly instructed the jury.  Because we uphold the first-degree murder conviction on a theory of premeditation, we need not address lying in wait.

2

FACTS

*Prosecution Case*

It was late in the evening on May 19, 2015, when Luis and his friend Jarret were hanging out near Jarret's house, smoking and drinking beer. They called Bryan Ortega, the victim, to join them. Ortega told them he was on his way.

Luis and Ortega were around 20 years old and had been friends since middle school. Luis did not know Ortega to have any enemies and considered him nonviolent.

Jarret went inside his home to use the bathroom. Luis waited outside near Jarret's home and watched videos on his phone. A man later identified as defendant approached Luis. Defendant wore a black hooded sweatshirt, a hat, and shorts. Defendant asked Luis, "Do you have a cigarette?" Luis told him "no" without looking up from his phone. Defendant walked past Luis and went around the corner.

About three to four minutes later, defendant approached Luis from the same direction as the initial encounter. Defendant asked Luis, "Do you skate?" and "Let's play skate." Luis, who had a skateboard, responded, "No." Defendant walked past Luis and around the corner, out of Luis's sight.

Shortly afterward, Luis heard screaming, which he thought was "two little kids like play fighting." Luis heard additional screams and ran around the corner. He saw defendant holding Ortega from the neck. Luis shouted, "Get the fuck off of him." Defendant "sliced or did something" and ran away.

3

Luis approached Ortega, who appeared badly hurt. Luis, in a state of shock, picked Ortega up and put him back down. Forgetting about the phone in his pocket, Luis ran to Jarret's home, banged on the window, and told Jarret to call the police.

The neighbor next door had a security system with four exterior cameras. He heard Ortega scream that evening and came out of his house to find Ortega's bloodied body on the ground. The police showed up shortly after and the neighbor invited them inside to view the video recording from his surveillance cameras. The police ultimately took the surveillance system from the neighbor's house.

Detective Ramirez from the Garden Grove Police Department was the lead detective in this case. Detective Ramirez viewed the surveillance video at least 50 times, including about five to 10 times while inside the neighbor's home. Detective Ramirez primarily focused on the video of the actual attack. A video edited to show only the assault was played at trial.

Detective Ramirez pointed out various aspects of the video that she perceived based on her investigation and repeated viewings. She explained that during the initial attack, defendant made "[a] thrusting motion that appeared to be a stabbing motion." Defendant made this motion four times at Ortega's upper body. It appeared that defendant held a shiny object in his right hand during these initial four thrusting motions. Defendant fell on his rear. His right hand swung out and the object he was holding fell to the ground. Defendant and Ortega struggled. Defendant retrieved the object he had dropped. Defendant charged at Ortega and made four or five stabbing or thrusting motions at Ortega's upper body.

4

Other portions of the surveillance video showing defendant in the area prior to the assault were played at trial: (1) on May 17, defendant rode a bicycle at about 8:47 p.m. and walked by around 10:33 p.m.; (2) on May 18, defendant walked in the area around 8:51 p.m. and rode a bicycle at 10:37 p.m.; and (3) in the early hours of May 19, defendant walked in the area around 12:38 a.m. and 1:11 a.m. Other than defendant's comings and goings, Detective Ramirez described the traffic in that area as "minimal to none" during the evening hours.

Aside from the video, Detective Ramirez's investigation at the scene resulted in two other relevant developments. First, she noted that the lighting in the area where the attack occurred was darker than the surrounding area. Second, a hat was recovered at the scene. Detective Ramirez submitted the hat to a crime lab for DNA testing in an attempt to identify the attacker. A few days later, the lab notified Detective Ramirez that DNA on the hat was a match for defendant.

On May 22, 2015, police searched defendant's home pursuant to a warrant. Detective Ramirez, who participated in the search, noted a blood smear on the wall near the stairs. She also found a blood stain on the mattress topper in defendant's room. Laboratory tests would subsequently reveal that both blood stains contained the victim's DNA.

Police also searched defendant's computer. They found that in the hours after the homicide, defendant performed an internet search for "fingerprints on weapon." He also searched for "weapon was found at a murder scene."

Detective Ramirez interviewed defendant. She noticed he had scrapes on his knuckles and his right hand was swollen. He had a scratch on the left side of his neck. And his hair was freshly shaved in a buzz cut. She also noticed he had blood under his finger nails. In response to Detective Ramirez noticing that, defendant began attempting to pick the blood out from under his nails.

5

An autopsy showed that Ortega had 12 stab or slash wounds. Ortega's cause of death was multiple sharp force injuries to his head, neck, chest, and "left upper extremity."

Defendant and the victim, Ortega, had attended the same high school for a period of time. There were no other apparent connections between the two.

*Defense Case*

Defendant's mother testified that his life began deteriorating late in high school and in college when he started smoking a lot of marijuana and spending time with unsavory friends. Both defendant's mother and brother testified that defendant was talking to himself in odd ways before the murder. Defendant's mother was growing concerned because defendant was hearing things that were not there. Neither noticed anything odd about defendant on the day of the murder.

Dr. Pitt, a psychiatrist, evaluated defendant and reviewed materials in this case including police reports and his medical records. Dr. Pitt opined that on the night of the incident, defendant suffered from "longstanding major depressive disorder with psychotic features as well as dysthymia, which is a lower level of chronic depression." As a result, defendant was experiencing auditory hallucinations. People suffering from defendant's disorder are more likely to be aggressive. They also may have impaired judgment and impulse control. Defendant's disorder negatively impacted his ability to weigh and consider decisions.

On cross-examination, Dr. Pitt acknowledged that the evidence of defendant's major depressive disorder was mostly based on his own words, rather than objective evidence. She conceded that defendant had an "obvious reason" to malinger, and the two most common disorders that were malingered were psychosis and depression.

6

Four of defendant's friends testified that defendant did not have an aggressive or violent personality.

*Rebuttal*

Detective Ramirez interviewed defendant on the day of his arrest for approximately four hours. Defendant did not do or say anything bizarre, and responded appropriately to questions. Defendant did not say that he was depressed or mention hearing voices.

During argument, defense counsel conceded that defendant murdered Ortega. The sole issue was whether the murder was in the second or first degree.

DISCUSSION

*Detective Ramirez's Commentary on the Surveillance Video*

Defendant first contends the court abused its discretion in permitting Detective Ramirez to comment on what she perceived in the surveillance video. We conclude her testimony was admissible and that, in any event, the testimony was harmless. We review the court's admission of evidence for abuse of discretion. (*People v. Sánchez* (2016) 63 Cal.4th 411, 456.)

At trial, the court held an Evidence Code section 402 hearing on the admissibility of the testimony. Detective Ramirez testified that she watched the video "at least 50 times." She explained that the first time she watched the video, she did not notice defendant's hat fly off, nor did she notice the shiny object (which she later clarified was "a stabbing instrument") fly out of defendant's right hand midway through the assault, but that she was able to perceive those events after repeated viewings. She explained that discerning the exact events that transpired was difficult because "there's so much going on. There's so much movement." She watched the video in slow motion.

7

The prosecutor described the video "as being black and white and having moderate resolution, meaning it is not of the quality one might see in a Nordstroms, and there are some events that take place closer to the cameras and some events that take place further from camera view."

Pinning down exactly what the objection was to Detective Ramirez's testimony proved elusive. After hearing Detective Ramirez's testimony at the Evidence Code Section 402 hearing, defense counsel commented, "So I am not quite sure what I'm asking to be excluded, but there are certain things that I agree are foundational that somebody who had seen the video could say. For instance, that appears to be [defendant] walking. That appears to be Bryan Ortega on the bicycle holding something." "I think that describing the actual physics of what's going on is fine . . . ." On the other hand, defense counsel went on to suggest that "the video really does speak for itself" and that Detective Ramirez's testimony was not helpful. Defense counsel noted that the video is "grainy enough that some of that is kind of ambiguous." "I just think it's too ambiguous to have a witness for the prosecution get up there and say this is what I see. I think the jury should decide what they see." Defense counsel went on to express concern "about the prejudicial effect it will have on the decision-making process of the jury."

On appeal, defendant contends the testimony was inadmissible secondary evidence of the video, inadmissible lay opinion, and inadmissible under Evidence Code section 352.[1] We address each in turn.

First, defendant contends Detective Ramirez's testimony violated the secondary evidence rule. Evidence Code section 1521, subdivision (a), provides, "The content of a writing may be proved by otherwise admissible secondary evidence."

---

[1] Defendant argues that, to the extent defense counsel failed to clearly articulate these objections, it was ineffective assistance of counsel. We elect to address the objections on their merits rather than address the ineffective assistance of counsel claim.

8

However, under Evidence Code section 1523, "oral testimony is not admissible to prove the content of a writing," with certain exceptions not applicable here. A video is a writing for purposes of the secondary evidence rule. (Evid. Code, § 250; *People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

The weak point in defendant's argument is that the writing was admitted into evidence. Defendant has not pointed to any case in which the secondary evidence rule was applied even though the writing itself was admitted into evidence, nor are we aware of any such case. In our view, the purpose of Detective Ramirez's testimony was not to "prove the content" of the video, but instead to highlight important details in the video—details that might otherwise be missed.

Defendant's second argument is that Detective Ramirez's testimony was inadmissible lay opinion testimony. Evidence Code section 800 provides, "If a witness is not testifying as an expert, [her] testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of [her] testimony."

Preliminarily, we fail to see any opinions expressed in Detective Ramirez's testimony. She essentially just testified to what she saw. Defendant has not pointed to any portion of her testimony that is disputed. If she had witnessed the actual murder and given the exact same testimony, we certainly would not characterize it as opinion testimony. It would be percipient testimony. Why does it become an opinion just because she saw it in a video?

But assuming, for the sake of argument, that her testimony does consist of opinion testimony, the court did not abuse its discretion in finding that it was helpful for the jury. Detective Ramirez testified she watched the video at least 50 times and that subsequent viewings revealed details she had not picked up on at first. While it is true, as defendant argues, that the jury could have watched the video repeatedly and picked those

9

details up on their own, the standard is not whether the testimony was essential. It's whether it was helpful. Here, the jury was able to speed up the process of teasing out obscure details in the video with the aid of Detective Ramirez's testimony. That was helpful.

Our holding is consistent with federal caselaw on the narration of a video. In *U.S. v. Torralba-Mendia* (9th Cir. 2015) 784 F.3d 652, where the defendant was charged with a conspiracy to smuggle immigrants, an immigration officer was permitted to narrate surveillance videos "showing vehicles dropping off and picking up people . . . . He told the jury the duration of time lapses in the videos, pointed out the vehicles' identifying marks, tied the cars to various conspirators, and counted the number of people exiting and entering different vehicles." (*Id.* at pp. 657–658.) The court held that "an officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see." (*Id.* at p. 659.) It held that the officer's narration in that case "helped the jury understand the import of the videos." (*Id.* at p. 660; see *U.S. v. Begay* (9th Cir. 1994) 42 F.3d 486, 503 [permitting narration of a video where officer had viewed it 100 times, and stating, "To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time."])[2] Similarly, here, Detective Ramirez's testimony helped the jury process the details of the surveillance video.

Lastly, defendant contends the probative value of Detective Ramirez's testimony was substantially outweighed by its prejudicial effect under Evidence Code section 352. However, this argument only serves to highlight a glaring flaw in defendant's overall evidentiary argument: the total lack of prejudice. Defendant argues, "this testimony created a serious risk of causing undue prejudice and confusion because, once the jurors heard this testimony, they were likely to defer to the officer's opinions

---

[2] Rule 701 of the Federal Rules of Evidence (28 U.S.C.), concerning lay opinion testimony, is essentially the same as our Evidence Code section 800.

10

about what was shown in the video instead of properly making their own independent assessment of the video." But defendant has not pointed to any portion of Detective Ramirez's testimony that is even contested, much less wrong. So far as we can tell, Detective Ramirez pointed out aspects of the video that everyone agrees on. Moreover, the issue in this case was not whether defendant murdered Ortega—he did—but instead whether he could form the requisite mental state for first degree murder. Detective Ramirez's narration of the video did not address that issue. We may only reverse for evidentiary error if, after considering the entire record, we believe there was a reasonable probability of a different outcome in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836) Detective Ramirez's narration could not possibly have affected the outcome.

*Premeditation*

Defendant does not challenge the sufficiency of the evidence of premeditation. Instead, he contends the prosecutor committed misconduct by misstating the law during closing argument. In particular, the prosecutor offered two examples of premeditation: a yellow light example, and a second shot example.

Here is the relevant portion of the prosecutor's argument: "Rarely do people who kill have a good enough reason for what they did. This [i.e., premeditation] isn't my motive or what I think would be a good idea. It's simply a consideration of consequences and actions. And that the decision to kill is made during the course of killing, if not wholly before. [¶] Some examples of this are the difference between shooting someone a single time and pulling the trigger a second time. [¶] The decision a person makes when approaching a yellow light as it may be likely to phase red. A weighing of consequences. Am I going to make it? Am I going to be involved in an accident? Am I going to get a ticket? I look to the left. I look to the right. And I go for it." Defense counsel did not object to these examples. Instead, defense counsel

11

specifically addressed the yellow light example in his closing argument: "Now, I agree, we can make decisions very carefully, but the example of running through a yellow light is not something that we typically weigh and consider carefully. We kind of do it impulsively; right? [¶] We don't really think about it. We just do it. Deciding who you're going to marry. Deciding what you're going to serve at a dinner party. That's more carefully considered and weighed."

"'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.) "When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Generally, "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and . . . requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) But a "defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue . . . that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez, supra,* 42 Cal.4th at p. 966.) Counsel's ineffective assistance requires reversal if counsel's performance was deficient and caused prejudice. (*Ibid.*) Defendant once again claims ineffective assistance of counsel. We elect to address the merits.

We see no error in the yellow-light example. At least in the way the prosecutor framed it, if someone were to go through the decision-making process the

12

prosecutor described, the decision to proceed through the intersection would be premeditated.

Defendant cites *People v. Avila* (2009) 46 Cal.4th 680 for the proposition that this example is improper, but he reads too much into that decision. The Supreme Court's exceedingly brief discussion of the issue consists of the following: "Nor, contrary to defendant's assertion, did the prosecutor argue that 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.'" (*Id.* at p. 715.) From this offhand discussion, defendant extracts the principle that it is improper to analogize premeditation to a yellow light unless it is accompanied by the caveat that going through a yellow light is less serious than murder. We are not sold. The only thing the *Avila* court said was that the prosecutor did not argue that going through a yellow light is the "equivalent" of murder. The prosecutor in our case did not draw such an equivalence either. It was obviously an analogy. *Avila* is no help to defendant.

The second-shot example is on shakier footing. A second shot does not necessarily demonstrate premeditation. As defendant puts it, "this could happen almost instantaneously, with merely one additional twitch of the finger." On the other hand, the prosecutor's example was not a complete misstatement of the law—there are some cases where the number of shots fired, coupled with other circumstances, does suggest premeditation. (E.g. *People v. Welch* (1999) 20 Cal.4th 701, 759 [second shot tended to

13

show premeditation]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [firing six shots tended to show premeditation].)  The example is an ambiguous one that we would not encourage prosecutors to use in the future without more context.

Even so, any error was harmless under the circumstances here.  The prosecutor mentioned the second-shot example once, briefly, in closing argument, and repeated it, equally briefly, in rebuttal.  He did not dwell on the example.  Nor is the example particularly germane to this case.  This is not a gun case.  Moreover, defendant's argument was that his mental health problems precluded him from premeditating.  The second-shot example has no bearing on that issue.  Additionally, defendant does not contend the jury was improperly instructed.  Thus we presume the instructions were correct.  Under these circumstances, the second-shot example could not have swayed the outcome of the trial.

Our resolution of this issue resolves the remainder of the appeal. Defendant's final argument is that the evidence did not support a lying-in-wait theory of first-degree murder.  But even if that is true, the jury made a separate finding on premeditation, and that finding independently supports the verdict.  (Pen. Code, § 189, subd. (a) ["All murder that is perpetrated by means of . . . lying in wait . . . *or* by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree" (italics added).)  Accordingly, the lying-in-wait theory, even if unsupported, did not affect the outcome of the trial.  In the absence of prejudice, it cannot be reversible error.

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

15